IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DANIEL M. WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:21-CV-557-MHT-KFP |
| | ) | |
| MONICA P. MCCOY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.    INTRODUCTION

Plaintiff Daniel Wilson, proceeding pro se and in forma pauperis, filed this action under 42 U.S.C. § 1983 during his incarceration at Easterling Correctional Facility.[1] *See* Doc. 1.[2] Wilson's Amended Complaint alleges violations of his rights under the First and Eighth Amendments by Warden Monica McCoy, Warden John Crow, Sergeant Dranarrius Lovejoy, and Correctional Officers George Jones, Quindarius Thagard, Latasha Jackson, and Samuel Smith. Doc. 14 at 1–4. For relief, Wilson seeks $500,000 in damages, release from prison, and closure of Easterling.[3] *Id.* at 5.

_____

[1] Wilson was released from custody of the Alabama Department of Corrections while this action was pending. *See* Doc. 43.

[2] All citations refer to document and page numbers assigned by the Clerk in the docketing process.

[3] A § 1983 action does not provide a remedy for a state prisoner asserting a constitutional challenge to the fact or duration of his detention. *See Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973). Thus, even if Wilson had not been released from prison, his request for "my freedom" (Doc. 14 at 5) must be addressed in an application for habeas corpus relief. *Id.* at 500. Further, to the extent Wilson seeks prospective injunctive relief by requesting that Easterling be closed, this relief is also unavailable. As the Eleventh Circuit has explained, "because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate—as opposed to a merely conjectural or hypothetical—threat

Defendants filed an Answer, Special Report, and supporting evidentiary materials addressing Wilson's claims for relief and denying that they violated his constitutional rights. Doc. 31. After reviewing the Special Report, the Court issued an Order requiring Wilson to respond with affidavits or statements made under penalty of perjury and other evidentiary materials. Doc. 33 at 2. The Order specifically cautioned that the "Court may at any time [after expiration of the time for Wilson to file a response] and without further notice to the parties (1) treat the Special Report and any supporting evidentiary materials as a . . . motion for summary judgment . . . and (2) rule on the dispositive motion in accordance with the law after considering any response filed in compliance with this Order." *Id*. Accordingly, the Court now treats Defendants' Special Report as a motion for summary judgment and concludes it is due to be granted.

## II.    SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, a reviewing court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of

---

of future injury." *Wooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1284 (11th Cir. 2001) (holding that "[t]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future"). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–496 (1974). Rather, "[t]he general rule is that a prisoner's transfer or release from a jail moots his individual claim for declaratory and injunctive relief," even when "there is no assurance that he will not be returned to the jail." *McKinnon v. Talladega Cnty., Ala.*, 745 F.2d 1360, 1363 (11th Cir. 1984) (holding that an inmate's claim was moot where he challenged "unconstitutional conditions in a single jail where [he] is no longer incarcerated"). Because Wilson is no longer incarcerated, he cannot allege a real and immediate threat of future injury regarding the challenged conduct that occurred at Easterling, and his request for equitable relief is moot. *See Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) (explaining that, "[a]bsent class certification, an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been [released]").

law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. . . . [A dispute] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party asking for summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and alerting the court to portions of the record that support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant has satisfied this burden, the nonmovant is similarly required to cite portions of the record showing the existence of a material factual dispute. *Id.* at 324. To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In determining whether a genuine dispute for trial exists, the court must view all the evidence in the light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmoving party's favor. *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see* Fed. R. Civ. P. 56(a).

## III.   BACKGROUND

### A.   Wilson's Sworn Allegations

 In his sworn Amended Complaint, Wilson alleges that on May 18, 2021, between 7:00 p.m. and 8:30 p.m., haircuts were being given to inmates in the restricted housing unit. Doc. 14 at 3. Identifying as "Rastafory," Wilson told Sgt. Lovejoy and Lt. Jones that his

religion forbade him to cut his hair and that he had a religious profile excusing him from having his hair cut. *Id.* Wilson claims Lt. Jones said "he didn't care," "overlooked the matter," and, with help from Sgt. Lovejoy and Officer Thagard, "forcefully with handcuffs behind [his] back against [his] will" held Wilson down and shaved his head. *Id.*; Doc. 14-1 at 1. More specifically, Wilson states the above Defendants "forcefully grabbed and pushed [him] to the wall then forced [him] down to a chair holding [him] down very forceful with handcuffs already to [his] back."[4] Doc. 14 at 3. Officers Jackson and Smith boxed Wilson in to prevent him from moving. *Id.* and Doc. 14-1 at 1. As Officer Thagard escorted Wilson back to his cell, he roughly pulled Wilson's arm. Doc. 14 at 3. Wilson states his hand was swollen from being held down to get his hair cut, and he "even had to get x-rays on [his] hand" before leaving Easterling.[5] *Id.* and Doc. 14-1 at 2.

### B.    Defendants' Factual Responses and Other Record Evidence

Defendants' evidentiary submissions include their affidavits, agency regulations and rules, and prison records.[6] The institutional incident report reflects the following:

---

[4] Under departmental policies, inmates housed in restricted housing units, like disciplinary segregation, must be handcuffed behind their backs when moved in or out of a cell. *See* Alabama Department of Corrections Administrative Regulation No. 434 at ¶ 4(a). *Available at* https://doc.alabama.gov/Regulations. The parties appear to reference "disciplinary segregation" and "restricted housing" to reference the areas within which additional limitations are imposed on inmates, such as being placed in handcuffs during movement. There is no evidence before the Court indicating a distinction between "disciplinary segregation" and "restricted housing."

[5] Attachments to Wilson's Amended Complaint show that he remained at Easterling through at least the end of June 2021. *See* Doc. 14-2.

[6] Defendants have provided copies of prison records, regulations, and rules but have not submitted a certificate of authenticity from a records custodian or other qualified witness. Because Wilson does not challenge the authenticity of the records, they are treated as authentic. *See O'Connor v. Carnahan*, No. 3:09-CV-224-WS-EMT, 2015 WL 6405976, at *5 (N.D. Fla. Sept. 21, 2015), *report and recommendation adopted sub nom. O'Connor v. Carnahan*, No. 3:09-CV-224-WS-EMT, 2015 WL 6182680 (N.D. Fla. Oct. 21, 2015) (finding prison records' authenticity could not reasonably be challenged under Fed. R. Evid. 902(11) or Fed. R. Evid. 803(6)).

On May 18, 2021 Correctional Sergeant Dranarris Lovejoy was assigned as the Restrictive Housing Unit Supervisor. At approximately 7:30 PM, Sgt. Lovejoy ordered inmate Daniel Wilson, B/260779, (B2-47A), several times to sit down and receive a haircut. Inmate Wilson failed to comply with Sgt. Lovejoy's order and refused to sit down and get a haircut. Sgt. Lovejoy put his right hand on inmate Wilson's right shoulder and Correctional Officer Quindarius Thagard put his right hand on inmate Wilson's left shoulder and help guide inmate Wilson in the chair as he sat down in the chair. Inmate Wilson receive a haircut. During inmate Wilson haircut he stated, "I'm gone stab you Sgt. Lovejoy, Officer Thagard, and the inmate cutting my hair", he also stated that "If anybody open my cell trap door, I'm gone throw urinal on them". Sgt. Lovejoy verbally reprimand inmate Wilson of his negative behavior. At approximately 7:35 pm, Sgt. Lovejoy reported the incident to Correctional Lieutenant Dominic Jones. Inmate Wilson remained housed in Restrictive Housing Unit Cell B2-47 pending disciplinary action; Failed to Obey and Threats. 5/18/2021 8:36 PM by dranarris.lovejoy 5/27/2021 7:57 PM by dranarris.lovejoy 6/8/2021 5:45 PM by dranarris.lovejoy

On August 16, 2021, Correctional Captain Joseph Danzey viewed the above incident and determined that this incident was a Use of Force Incident. The incident was labeled a Failure to obey and Threats by Correctional Sergeant Dranarris Lovejoy. There were no staff statements, pictures, body charts or Inmate Use of Force Statements conducted during this incident due to Sergeant Lovejoy not following ADOC protocols. Sergeant Lovejoy also did not follow Easterling Correctional Facility's Standard Operating Procedures. If the proper protocols would have been followed, the outcome of the incident would have been a Use of Force Incident. This mishandling of this incident will be handled Administratively. Although the incident was mishandled, the minimal force was justified. 8/19/2021 11:15 AM by joseph.danzey

Doc. 31-2 at 1.[7]

Sgt. Lovejoy testifies that Wilson's hair was very long and not in compliance with Alabama Department of Corrections' (ADOC) rules and regulations. Doc. 31-5. Therefore, he instructed Wilson several times to sit down for a haircut, but Wilson refused. *Id*.; Doc. 31-4 at 1. When Wilson refused, Sgt. Lovejoy and Officer Thagard put their hands on

---

[7] The narrative summary of the incident report is reproduced verbatim from the original document.

Wilson's shoulders to place him in the chair to receive a haircut. Docs. 31-5, 31-6, 31-11. Wardens McCoy and Crow testify that, because Wilson's hair length did not conform to ADOC grooming standards, Sgt. Lovejoy and Officer Thagard were within their authority as correctional officials to require Wilson to receive a haircut. Doc. 31-9 at 1; Doc. 31-11 at 1–2. Warden McCoy adds that agency regulations provide an exception for growing facial hair,[8] but no exception allows inmates to avoid haircuts based on a religious preference. Doc. 31-9 at 1.

As the August 19, 2021, addendum to the incident report notes, the challenged event was not initially labeled as a use-of-force incident; thus, Sgt. Lovejoy did not obtain supporting documents concerning the incident, including a body chart, staff statements, pictures, or the inmate's use-of-force statement. Docs. 31-2 at 1, 31-9 at 3. The investigative report reflects that, other than Sgt. Lovejoy and Officer Thagard placing their hands on Wilson's shoulders to guide him into the chair to receive a haircut, no other physical contact occurred. Doc. 31-9 at 4.

Officers Jackson and Smith testify that Wilson refused orders to sit down and get his hair cut, and Sgt. Lovejoy and Officer Thagard put their hands on Wilson's shoulders, using minimal force to guide him into the chair to receive a haircut. Docs. 31-7, 31-8. Officer Jones testifies that he did not know about the challenged incident, that Wilson's

---

[8] Defendants' evidentiary materials include a copy of Administrative Regulation Number 462 (dated August 11, 2015), which establishes the responsibilities, policies, and procedures for recognized religious beliefs and practices of committed offenders. Doc. 31-10. Under this regulation, inmates may apply for a religious exception to the grooming policy (limited specifically to approved religions) to grow a full beard, including a mustache, of no more than one-half inch in length. *Id*. at 4.

claims are false and without merit, and that he did not violate Wilson's rights.[9] Doc. 31-12.

## IV.   DISCUSSION

Wilson alleges that Defendants' conduct and actions in requiring him to cut his hair violated his First and Eighth Amendment rights. Doc. 14. Defendants contend, among other things, that Wilson's claims lack merit, that they did not violate Wilson's constitutional rights, and that they are entitled to immunity in their official and individual capacities. *See* Doc. 31 at 2–3, 7, 9–12.

### A.   Sovereign Immunity for Official-Capacity Claims

Defendants assert that Wilson's Amended Complaint is barred by Eleventh Amendment immunity to the extent it seeks monetary damages against them in their official capacities. Doc. 31 at 7–8. Official capacity suits are "in all respects other than name . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As a result, a state employee may not be sued in his or her official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp.*

---

[9] Wilson signed his Amended Complaint under penalty of perjury. Doc. 14 at 5. Therefore, the Court will treat it as evidence when ruling on the motion for summary judgment. *See Sears*, 922 F.3d at 1206. However, Wilson's responses in opposition to Defendants' dispositive motion (Docs. 35, 37) are unsworn and will not be considered as evidence in ruling on Defendants' motion. *Roy v. Ivy*, 53 F.4th 1338, 1348–1350 (11th Cir. 2022) (holding that, for prisoner's unsworn statement to be considered on summary judgment, it must meet the statutory requirements of § 1746—the declarant must at a minimum (1) date and sign the document, (2) state that its contents are true, and (3) place himself under penalty of perjury). *Id.* at 1348, 1350 (adopting reasoning in *Nissho-Iwai Am. Corp. v. Kline*, 845 F.2d 1300, 1305–1306 (5th Cir. 1988)). Excusing this omission would allow a plaintiff "'to circumvent the penalties for perjury in signing onto intentional falsehoods.'" *Id.* at 1350 (quoting *Nissho-Iwai American Corp.*, 845 F.2d at 1306); *see also Carr v. Tatangelo*, 338 F.3d 1259, 1273 n.26 (11th Cir. 2003), *as amended* (Sept. 29, 2003) (explaining that unsworn statement cannot raise fact issue precluding summary judgment); *McCaskill v. Ray*, 279 F. App'x 913, 915 (11th Cir. 2008) (holding district court should not have considered unsworn and unverified allegation in deciding summary judgment).

*v. Halderman*, 465 U.S. 89, 100 (1984), or Congress has abrogated the immunity, *see Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 59 (1996).

"Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (*citing Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1525 (11th Cir. 1990)). Accordingly, Defendants are entitled to sovereign immunity as to all claims seeking monetary damages against them in their official capacities. *See, e.g.*, *Selensky v. Alabama*, 619 F. App'x 846, 849 (11th Cir. 2015) ("[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]."); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277  (11th Cir. 1998) (holding that state officials in their official capacities are protected under the Eleventh Amendment from suits for damages); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

## B.    Qualified Immunity for Individual-Capacity Claims

To the extent Wilson sues Defendants in their individual capacities, Defendants argue they are entitled to qualified immunity. Doc. 31 at 11–12. Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if the underlying conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but immunity from suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the

earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009) (citation and internal quotation marks omitted).

To receive qualified immunity, a defendant first must prove that he or she was acting within the scope of discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). To determine whether a defendant has met this burden, "a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties. The scope of immunity 'should be determined by the relation of the [injury] complained of to the duties entrusted to the officer.'" *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282–83 (11th Cir. 1998) (citations omitted).

Here, Defendants maintain they were attempting to have Wilson comply with the institution's grooming policy at the time of the challenged incidents. Doc. 31 at 12. It was within the context of this interaction that Wilson alleges the constitutional violations occurred. Thus, Defendants have established that they were acting within the course and scope of their discretionary authority when the alleged conduct occurred and are, therefore, entitled to claim qualified immunity.

Accordingly, the burden shifts to Wilson to present evidence that Defendants are not entitled to qualified immunity. *See, e.g.*, *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003). For an official to lose qualified immunity, Wilson must show both that the defendant committed a constitutional violation and that the constitutional right the defendant violated was "clearly established." *Brown v. City of Huntsville, Ala*., 608 F.3d 724, 734 (11th Cir. 2010) (citation omitted); *see also Crosby v. Monroe Cnty.*, 394 F.3d

1328, 1332 (11th Cir. 2004). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. . . . In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations and internal quotation marks omitted) (alteration in original); *see also Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019). "The test is conjunctive, and if a plaintiff fails either prong of the qualified immunity analysis, his claim is barred." *Edger v. McCabe*, 84 F.4th 1230, 1235 (11th Cir. 2023). If a plaintiff cannot establish both elements, the defendant is entitled to qualified immunity, and the court may analyze the elements "in whatever order is deemed most appropriate for the case." *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241–42). Therefore, taking Wilson's allegations as true on consideration of the summary judgment motion, the Court considers whether Wilson's allegations that Defendants infringed on his rights to freedom of religion and free speech and used excessive force against him articulate violations of his First and Eighth Amendment rights.[10]

### 1.   Free-Exercise-of-Religion Claim Under the First Amendment

Wilson claims Defendants forced him to cut his hair, for which he had a religious profile, in violation of his First Amendment rights.[11] The First Amendment, applied to the

---

[10] "While . . . there is no per se rule barring qualified immunity in Eighth Amendment cases, [only] where the plaintiff has sufficiently alleged or shown a material dispute of fact as to an excessive force claim [is] summary judgment based on qualified immunity . . . not appropriate." *Bowden v. Stokely*, 576 F. App'x 951, 954–55 (11th Cir. 2014) (citation omitted).

[11] Defendants argue courts have looked to the Religious Freedom and Restoration Act ("RFRA") to establish the appropriate standard to review a Rastafarian inmate's First Amendment claim challenging a

states via the Fourteenth Amendment, "prohibits government from making a law prohibiting the free exercise (of religion)." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (internal quotation marks and citation omitted) (parentheses in original). Although prisoners retain their First Amendment rights, including rights under the free-exercise-of-religion clause, the law is settled that "central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974); *Bell v. Wolfish*, 441 U.S. 520, 546 (1979) (stating that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees"). "In the First Amendment context . . . some rights are simply inconsistent with the status of a prisoner or with the legitimate penological objectives of the corrections system." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quotation marks and citation omitted).

An essential element of a claim brought under the Free Exercise Clause is a showing that religious exercise was substantially burdened. *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) (stating that "[t]he free exercise inquiry asks whether government has

---

correctional official's conduct in forcibly removing him from his cell for a haircut. Doc. 31 at 9. However, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court declared RFRA unconstitutional as applied to the states because it exceeded congressional authority granted under section 5 of the Fourth Amendment. In September 2000, Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, et seq., which protects prisoners from government-sponsored infringement on religious practices by resurrecting RFRA's substantial burden and strict scrutiny standards. Enactment of RLUIPA was based on congressional authority under both the Spending and Commerce Clauses. *See* 42 U.S.C. § 2000cc-1(b)(1)(2). Even if Wilson's Amended Complaint could be liberally construed to raise a RLUIPA claim, RLUIPA only allows for prospective injunctive relief. *Sossamon v. Texas*, 563 U.S. 277 (2011); *see also* 42 U.S.C. § 2000cc–1(a). Wilson cannot show that he is entitled to injunctive relief because he is no longer in ADOC custody.

placed a substantial burden on the observation of a central religious belief or practice"); *Wilkinson v. GEO Grp., Inc.*, 617 F. App'x 915, 917 (11th Cir. 2015) (citing *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1549 (11th Cir. 1993) (holding that, "[t]o establish a violation of his right to free exercise, [the plaintiff] must first establish that a state actor imposed a 'substantial burden' on his practice of religion")). A "substantial burden" is "more than an inconvenience." *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004) (addressing RLUIPA claim). "[A] substantial burden occurs if the conduct complained of completely prevents the individual from engaging in religiously mandated activity, or . . . requires participation in an activity prohibited by religion and, at a minimum, must have something more than an incidental effect on religious exercise." *Hoever v. Belleis,* 703 F. App'x 908, 912 (11th Cir. 2017) (internal quotation marks and citation omitted).

A "prison regulation, even though it infringes the inmate's constitutional rights, is an actionable constitutional violation only if the regulation is unreasonable." *Hakim v. Hicks*, 223 F.3d 1244, 1247 (11th Cir. 2000) (citations omitted). A deferential standard of review is afforded prison officials and, therefore, "[i]n the prison context, the state actor can . . . defend the [challenged] action if it is 'reasonably related to legitimate penological interests.'" *Wilkinson*, 617 F. App'x at 917 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987); *see also Pope v. Hightower*, 101 F.3d 1382, 1384 (11th Cir. 1996) (observing that "[t]he Supreme Court considered this deferential standard necessary if prison administrators . . . and not the courts, [are] to make the difficult judgments concerning institutional operations") (quotation marks and citations omitted). Although "[t]he *Turner*

case provides four factors to assist a court's rationality review[,] [n]either *Turner* nor *O'Lone [v. Est. of Shabazz*, 482 U.S. 342 (1987),] . . . *require* a court to weigh evenly, or even consider, each of these factors."[12] *Scott v. Mississippi Dep't of Corr.*, 961 F.2d 77, 80 (5th Cir. 1992) (emphasis in original).

Defendants' evidence reflects that inmates in custody of the Alabama prison system receive a handbook explaining the basic rules applicable to living within the custody and control of the ADOC. Doc. 31 at 9. Rule 101 governs "Personal Appearance/Clothing." Doc. 31-13 at 1. The grooming guidelines require haircuts that are off the neck and ears with sideburns no lower than mid-ear for safety, identification, and security purposes. *Id.* Prison barbers receive instructions regarding proper inmate haircuts, and they may not give special haircuts. *Id.* As discussed, ADOC policy allows for a religious exception to the grooming policy for beards. Notably, on November 2, 2017, Wilson completed a religious declaration form in which he selected Muslim as his religious preference. Doc. 31-9 at 5. Wilson indicated that the name of his religious community was "The Sumi Muslims," that he had been a member for two years, and that he sometimes received religious instruction. *Id.* Also on November 2, 2017, Wilson submitted a religious exception to the inmate grooming policy for beards declaring his religious preference as Muslim. *Id.* at 6. The

---

[12]The four factors set forth in *Turner*, 482 U.S. 78 are as follows:

> (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (3) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates, and the allocation of prison resources generally; and (4) whether the regulation represents an "exaggerated response" to prison concerns.

*Hakim*, 223 F.3d at 1247-48 (*citing Turner*, 482 U.S. at 89-91).

chaplain disapproved the request on the ground that the grooming exception applies only to Sunni Orthodox Muslims. *Id*. The record contains no evidence that Wilson submitted a declaration changing his religious preference from Muslim.[13] *Id*.; Doc. 31-9 at 1.

Based on this record, the Court cannot find that Defendants' actions requiring Wilson to cut his hair placed a substantial burden on his religion. There is no dispute that Wilson's hair did not comply with the ADOC grooming policy, and Wilson does not dispute that the prison grooming policy relates to a legitimate penological interest. Other than making the conclusory allegation that being required to get his hair cut violated his First Amendment rights, Wilson does not describe how enforcement of the grooming policy substantially burdened the practice of his religion. And Wilson has not shown that Defendants' conduct requiring him to cut his hair caused more than an inconvenience on his religious exercise. He does not identify any religious significance hair length has, either in his faith generally or in his practice of his religion. He also does not claim that keeping his hair unshorn is a religiously mandated activity and, therefore, has not shown that Defendants' conduct in requiring him to receive a haircut within the confines of the grooming policy prevented him from engaging in a religiously mandated activity. Therefore, Defendants are entitled to qualified immunity on Wilson's First Amendment free exercise claim, and their motion for summary judgment is due to be granted. *See Smith v. Governor for Alabama*, 562 F. App'x 806, 813 (11th Cir. 2014) (*citing Smith v. Allen*, 502 F.3d 1255, 1278–79 (11th Cir. 2007), *overruled on other grounds by Hoever v. Marks*,

---

[13] Other than the religious exception to the grooming policy for beards, Defendants state there is no religious exception to the institutional policy that inmates receive haircuts.

993 F.3d 1353 (11th Cir. 2021), *and abrogated on other grounds by Sossamon v. Texas*, 563 U.S. 277 (2011)) (observing that the "substantial burden" standard requires "'something more than solely the denial of a request that is sincere'" and approving ADOC's requirement that prisoners support their request for religious accommodations with "authoritative sources" so as to demonstrate a "substantial burden"); *see also Harris v. Chapman*, 97 F.3d 499, 504 (11th Cir. 1996) (upholding a prison hair length regulation as furthering the compelling governmental interest of maintaining security).

### 2.    Free Speech Claim Under the First Amendment

Wilson purports to bring a First Amendment free speech claim based on his "right to say yes or no" to Sgt. Lovejoy's order that he receive a haircut. Doc. 14 at 3; Doc. 14-1 at 1, 3. A prisoner "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). While an inmate retains a First Amendment right to freedom of speech, this right is not absolute within the confines of the prison system. *Id.* (explaining that "challenges to prison restrictions that are asserted to inhibit First Amendment interests must be analyzed in terms of the legitimate policies and goals of the corrections system, to whose custody and care the prisoner has been committed in accordance with due process of law"). Rather, an inmate's free speech rights can be restricted or limited to accommodate the legitimate needs and objectives of prisons. *Jones v. N. Carolina Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 129–30 (1977); *see also Turner*, 482 U.S. at 89.

There is no dispute that Sgt. Lovejoy issued repeated orders for Wilson to "sit down and get a haircut," which Wilson intentionally disobeyed. Doc. 31-5; *see also* Doc. 31-4. Wilson's behavior demonstrated a blatant disregard for the authority of prison officials, undermining the essential need for control and discipline required in a prison facility. *See, e.g.*, *Nicholas v. Raro*, No. 95-CV-379H, 1997 WL 255291, at *4 (W.D.N.Y. Apr. 7, 1997) (explaining that "the continued smooth operation of a correctional facility is largely dependent upon inmate recognition of the guards' authority"). Wilson argues he was "well in [his] right to speak [his] mind and go off so it's not a threat . . . when . . . an officer goes against a person's 'out put' on life." Doc. 14-1 at 3. However, contrary to Wilson's belief that he had a right to debate whether he should receive a haircut, his claim that Sgt. Lovejoy infringed on his ability to contest the lawful order of a prison guard is not the type of speech protected by the First Amendment. *See Robinson v. Boyd*, 276 F. App'x 909, 910 (11th Cir. 2008). An inmate's limited First Amendment rights include no purported right to disobey the lawful orders of his custodians necessary to maintain order, security, and discipline in the prison environment. *See id.* (explaining that inmate who asked officer about wearing warm clothing did not possess a First Amendment right to argue the point after receiving a clear directive that the clothing was not permitted); *Smith v. Mosley*, 532 F.3d 1270, 1277 (11th Cir. 2008) (inmate's "false and insubordinate remarks," which violated legitimate prison regulations, were not protected speech).

Because Wilson has produced no evidence that he was engaged in protected speech or conduct, his First Amendment free speech claim is without factual or legal merit.

Therefore, Defendants are entitled to qualified immunity on this claim, and their motion for summary judgment is due to be granted.

### 3.    Excessive Force Claim under the Eighth Amendment[14]

A convicted inmate's claims of excessive force against prison officials are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) (*citing Whitley v. Albers*, 475 U.S. 312, 327 (1986), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010)) ("The Eighth Amendment's proscription of cruel and unusual punishments . . . governs prison officials' use of force against convicted inmates."). The "Eighth Amendment, among other things, prohibits 'cruel and unusual punishments.'" *Sconiers v. Lockhart*, 946 F.3d 1256, 1265 (11th Cir. 2020) (*citing* U.S. Const. amend. VIII); *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (staing that "the unnecessary and wanton infliction of pain" constitutes cruel and unusual punishment in violation of the Eighth Amendment).

Prison guards may use force to keep order, but they must balance the force needed to maintain or restore discipline with the risk of injury to inmates. *Hudson,* 503 U.S. at 6. "In general, prison officials are authorized to use force when a prisoner repeatedly fails to obey an order . . . . Officers are not required to convince every prisoner that their orders are reasonable . . . before resorting to force." *Pearson v. Taylor*, 665 F. App'x 858, 864

---

[14]Although Wilson references the Fourteenth Amendment in his Amended Complaint (Docs. 14 at 3, 14-1 at 1), based on the allegations presented, the Court finds Wilson's free speech and free exercise claims are properly addressed solely in the context of First Amendment violations and that his excessive force allegation is properly addressed solely in the context of an Eighth Amendment violation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (explaining that "a plaintiff's obligation to provide the 'grounds' of h[er] 'entitle[ment] to relief' requires more than labels and conclusions").

(11th Cir. 2016) (citations omitted). "[W]henever prison officials stand accused of using excessive physical force . . . the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6 (citation omitted); *see also United States v. Hill*, No. 23-10934, 2024 WL 1846733, at *11 (11th Cir. Apr. 29, 2024) (internal quotation marks and citations omitted) (reiterating "the longstanding principle that force, including "passive restraint," is excessive if it is "not rationally related to a legitimate nonpunitive governmental purpose").

The standard applied to an Eighth Amendment excessive force claim contains both a subjective and objective component. *Hudson*, 503 U.S. at 8. The subjective component requires that prison "officials act[ed] with a sufficiently culpable state of mind." *Id.* (internal quotations omitted). As for the objective component, a plaintiff must show "the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Id.* (internal quotations omitted). Not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Wilkins*, 559 U.S. at 37 (quotation marks and citation omitted). Further, "the use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." *Hudson*, 503 U.S. at 4. "Injury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38. However, "the relatively modest

nature of [an inmate's] alleged injuries will no doubt limit the damages he may recover." *Id*. at 40.

"When prison officials maliciously and sadistically use force to cause harm . . . contemporary standards of decency always are violated . . . whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." *Wilkins*, 559 U.S. at 37 (internal quotations and citation omitted). Thus, in an excessive force case such as the one at hand, "the core judicial inquiry is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Bowden*, 576 Fed. App'x at 953 (internal quotations and citation omitted).

> To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, 503 U.S. at 7–8, 112 S.Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S.Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S.Ct. 1078 (quoting *Johnson [v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973]).

*Skrtich v. Thornton*, 280 F.3d 1295, 1300–01 (11th Cir. 2002), *overruled on other grounds by Pearson*, 555 U.S. 223.

Defendants Lovejoy and Thagard maintain that they applied reasonable force on May 18, 2021, to compel Wilson's compliance with their orders that he receive a haircut.

In support of their motion for summary judgment, Defendants have presented evidence that Wilson refused repeated orders to comply with directives that he have his hair cut (Docs. 31-2, 31-4—31-9, 31-11); Sgt. Lovejoy and Officer Thagard placed their hands on Wilson's shoulders to get him in a chair to receive a haircut (Docs. 31-5, 31-6); an investigation into the incident, which included questioning of Sgt. Lovejoy and Officer Thagard about their actions on May 18, 2021, determined that "[t]he least amount of forced necessary was used to get inmate Wilson to get a haircut" (Doc. 31-9 at 4);[15] after Wilson's hair was cut he returned to his cell in the restrictive housing unit (Doc. 31-9 at 3); Wilson did not receive a body chart because it was not considered a use of force incident at the time the of the event (Doc. 31-9 at 3, 4 ); and Wilson was charged with disobeying a direct order of an ADOC officer and for threats for which he was found guilty (Docs. 31-3, 31-4).

On Wilson's excessive force claim, the parties do not dispute that Wilson eventually, but not immediately, complied with orders to sit down and receive a haircut. Wilson's sworn evidence describes his encounter with Lt. Jones, Sgt. Lovejoy, and Officer Thagard after his refusals to comply with orders to have his hair cut as being forcefully grabbed, pushed into a wall, and forced into a chair while being held down and with his hands cuffed behind him. Doc. 14 at 3. Wilson also describes being roughly pulled by his arm when Officer Thagard escorted him back to his cell. *Id.* The injury described by Wilson consists of a swollen hand, for which he maintains he had to get x-rays at an unspecified

---

[15] The investigative report indicates Wilson was not questioned about the May 18, 2021, incident because it was not initially labeled as a "use of force." Doc. 31-9 at 4.

time. *Id.* and Doc. 14-1 at 2. Wilson justifies his refusal to comply with the orders given by Sgt. Lovejoy and Thagard based on his claimed religion. *See* Doc. 14 at 3.

"[I]n evaluating the challenged conduct of prison officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment." *Ort v. White*, 813 F.2d 318, 322 (11th Cir. 1987). "[I]f force was applied in a good faith effort to maintain discipline, courts should give great deference to acts taken by prison officials in applying prophylactic or preventative measures intended 'to reduce the incidence of riots and other breaches of prison discipline.'" *McBride v. Rivers*, 170 F. App'x 648, 656 (11th Cir. 2006) (quoting *Williams v. Burton*, 943 F.2d 1572, 1576 (11th Cir. 1991)). While this deference "'does not insulate from review actions taken in bad faith or for no legitimate purpose, it requires that neither judge nor jury freely substitute their judgment for that of officials who have made a considered choice.'" *Ort*, 813 F.2d at 322 (quoting Whitley, 475 U.S. at 322). When the only question concerns the reasonableness of the force used by a prison official, the defendant will ordinarily be entitled to judgment as a matter of law. *See Campbell*, 169 F.3d at 1374 (explaining that "force does not violate the Eighth Amendment merely because it is unreasonable or unnecessary"); *McBride*, 170 F. App'x at 657 (noting that even where correctional officers could arguably have used less force after subduing an inmate, the inmate "failed to produce evidence showing that these measures were taken maliciously and sadistically for the very purpose of causing harm") (internal quotations omitted).

Given the evidence submitted by Defendants, the Court finds they have met their initial burden of showing, by reference to affidavits, the incident report, disciplinary

reports, the use of force investigative report, and other institutional documents, that there was a need for the application of force as a result of Wilson's conduct in repeatedly failing to comply with the direct orders of Sgt. Lovejoy and Thagard on May 18, 2021,[16] that Sgt. Lovejoy and Officer Thagard acted "in a good-faith effort to maintain or restore discipline" and not "maliciously or sadistically to cause harm," that these officers used a limited amount of force to control the situation for the security and safety of staff and inmates, and that the only force applied was the amount necessary to place Wilson in a chair to receive a haircut. *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (holding that use of some force justified when an inmate twice refused an order to return to his cell); *Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) (stating that "[w]hen an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials[, which] places the staff and other inmates in danger"). Defendants' evidence further reflects that no additional force was used or necessary once Wilson was seated and then returned to his cell. *See Bennett v. Parker*, 898 F.2d 1530, 1532–34 (11th Cir. 1990) (discounting inmate's claim as a conclusory allegation of serious injury "unsupported by any physical evidence, medical records, or the corroborating testimony of witnesses"); *Walker v. Thames*, No. 97-CV-1104-RV-L, 2001 WL 394911, *6 (S.D. Ala. March 30, 2001) ("While the continued pushing and shoving by the defendant may have been futile and unnecessary, it was not constitutionally excessive. Force does not violate the

---

[16] Along with receiving a disciplinary infraction for failing to obey a direct order, Wilson also received a disciplinary for making threats. According to the disciplinary report, on May 18, 2021, while in the restrictive housing unit lobby, Wilson told Officer Thagard "I'm gone stab you Officer Thagard when I get out of lock up." Doc. 31-3 at 1. Following a hearing, the hearing officer found Wilson guilty of this charged rule violation. *Id.* at 1–2.

constitution merely because it is unreasonable or unnecessary."). Considering this evidence, Wilson must present evidence that demonstrates a genuine dispute of fact for trial. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 607-08 (11th Cir. 1991). He has not done so.

Viewing the evidence in the light most favorable to Wilson, his allegations support no reliable inference that Sgt. Lovejoy, Officer Thagard, or any other correctional official used force maliciously to cause harm or engaged in a wanton infliction of pain. Put another way, the evidence fails to establish either (1) that Sgt. Lovejoy and Officer Thagard used any force in excess of that necessary to restore control over Wilson or (2) that they used force maliciously and sadistically to cause harm. For these reasons, Defendants Lovejoy and Thagard are entitled to qualified immunity on Wilson's excessive force claim in their individual capacities, and their motion for summary judgment is due to be granted. *See Celotex Corp.*, 477 U.S. at 322.

### 4. Failure-to-Intervene Claim

Because of the Court's determination on Wilson's excessive force claim, any claim he may have against Officers Jackson and Smith concerning a failure to protect him from the conduct of Sgt. Lovejoy and Officer Thagard also fails. Although an officer who does not participate in excessive force can be liable if he fails to take reasonable steps to protect the victim, *see Johnson v. White*, 725 F. App'x 868, 878 (11th Cir. 2018), he cannot be held liable for a failure to intervene without a valid underlying claim of excessive force. *Crenshaw v. Lister*, 556 F.3d 1283, 1294 (11th Cir. 2009). "Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being

committed." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019); *see also Raulerson v. Baily*, No. 1:08-CV-222-MP-GRJ, 2014 WL 4928904, at *3 n.2 (N.D. Fla. Oct. 1, 2014) (noting that "[b]y its nature, a claim of failure to intervene must include an underlying act of excessive force"). Accordingly, because a failure-to-intervene claim is "wholly dependent on the underlying excessive force claim," *Sebastian*, 918 F.3d at 1312, and because Sgt. Lovejoy and Officer Thagard are entitled to summary judgment on Wilson's excessive force claim, Officers Smith and Jackson are entitled to qualified immunity on the failure-to-intervene claim. The motion for summary judgment is due to be granted on this claim.

### C.     Supervisory Claims

To the extent Wilson seeks to impose liability on Wardens McCoy and Crow for the actions or omissions of a subordinate based on a theory of respondeat superior, he is entitled to no relief. "The standard by which a supervisor is held liable in [his or] her individual capacity for the actions of a subordinate is extremely rigorous." *Christmas v. Harris Cnty., Georgia*, 51 F.4th 1348, 1355 (11th Cir. 2022) (internal quotation marks and citation omitted). Supervisory officials cannot be held vicariously liable in § 1983 actions. *See, e.g.*, *Belcher v. City of Foley, Ala.*, 30 F.3d 1390, 1396–97 (11th Cir. 1994). As explained by the United States Supreme Court:

> Government officials may not be held liable for the unconstitutional conduct of their subordinates [or co-workers] under the theory of *respondeat superior* [or vicarious liability] . . . . A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties. Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead

> that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

*Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (internal quotation marks, citation, and parentheses omitted); *see also Cottone*, 326 F.3d at 1360 (quotation marks and citation omitted) (holding that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability").

Liability can attach to a supervisory official only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360; *see also Iqbal*, 556 U.S. at 677 ("Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). Here, Wilson fails to allege that any defendant in a supervisory role participated or had direct involvement in the alleged violations of his constitutional rights. To establish a sufficient causal connection without direct participation, a plaintiff must present sufficient evidence of either "a history of widespread abuse [that] put[] [a defendant] on notice of the need to correct the alleged deprivation, and [she/he] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or . . . facts [that] support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal quotation marks and citations omitted).

After careful review of the pleadings and evidentiary materials, the Court finds that Wilson presents no such evidence. Thus, Wardens McCoy and Crow are entitled to qualified immunity on claims against them based on a theory of respondeat superior or vicarious liability, and their motion for summary judgment is due to be granted.

## V.    CONCLUSION

For these reasons, the Magistrate Judge RECOMMENDS as follows:

1.      Defendants' Special Report (Doc. 31) be CONSTRUED as a motion for summary judgment.

2.      Defendants' Motion for Summary Judgment (Doc. 31) be GRANTED on all claims.

3.      This case be DISMISSED with prejudice.

4.      Cost be TAXED against Plaintiff.

It is further ORDERED that by **July 5, 2024**, the parties may file written objections to this Recommendation. An objecting party must identify the specific portion of the factual findings or legal conclusions to which the objection is made and must describe in detail the basis for the objection. Frivolous, conclusive, or general objections will not be considered. The Recommendation if not a final order and, therefore, is not appealable.

Failure to file a written objection to this Recommendation shall bar a party from a de novo determination by the District Court of any factual findings or legal conclusions contained herein and shall waive the right of the party to challenge on appeal any subsequent order that is based on factual findings and legal conclusions accepted or

adopted by the District Court, except upon grounds of plain error or manifest injustice. 11th

Cir. R. 3-1.

       DONE on this 14th day of June, 2024.


                    /s/ Kelly Fitzgerald Pate
                    KELLY FITZGERALD PATE
                    UNITED STATES MAGISTRATE JUDGE